The plaintiff roofing company in an original and supplementary petition asked for judgment against the defendant for $400, as the balance due for services rendered under a written contract whereby plaintiff undertook to furnish the necessary labor and materials to re-roof a substantial portion of defendant church building at Dixie, Louisiana, for a total consideration of $775.
Defendant in an original and supplementary answer, admitted the execution of the contract and that only $375 had been paid, but claimed that the remaining $400 had been extinguished by compensation and set-off as a result of damage to the contents of the defendant church resulting from water coming through the portions of the roof which had been uncovered by the roofing company and not re-covered in accordance with the contract or protected by adequate temporary roofing in the interim between the taking off of the original shingles and the nailing on of the new roof.
The case is before us on plaintiff's appeal from a judgment of the District Court sustaining the church's plea of compensation and set-off.
The re-roofing contract is contained in a proposal sent out by the roofing company on October 30th, accepted by the Dixie Presbyterian Church on November 3rd and approved as a final contract by the roofing company on November 5, 1947. The contract stipulated that the job be completed within approximately five working days "after the material has been delivered to the site and the building is ready for the uninterrupted application thereof." On *Page 309 
December 11, 1947, plaintiff began the work of removing and salvaging the old asbestos shingles and applying in their stead a tar paper sub-roof. No new shingles were delivered on the job due to scarcity of the re-roofing materials specified in the contract. However, the plaintiff continued, intermittently, to remove the heavy asbestos shingles and to apply sub-roofing paper to the surfaces of the church roof so exposed. Two of plaintiff's men were so engaged on the afternoon of December 31, 1947, until their work was interrupted by the occurrence of a heavy rain, accompanied by wind, the intensity of which is a matter of controversy between the parties to the suit. Portions of the tar paper sub-roof were blown away and considerable quantities of water came into the west half of the church building, damaging the walls, floor coverings, the organ, piano, and other contents on that side of the building.
Plaintiff's contention is that the water which entered the building and damaged the church property came as a result of a "vismajor," or, in the language of the common law, "Act of God," and that it is not responsible for the result of this inevitable accident.
The record shows that there was a heavy downpour of rain in that immediate locality and that it was accompanied by wind and hail sufficient for the occurrence to be considered a wind storm within the meaning of a wind storm policy on the church building itself and on one or more other buildings in the neighborhood. The record does not bear out plaintiff's contention that the storm in the Dixie community amounted to a tornado or cyclone. The winds were not sufficient to disturb the old roof on the east side of the church building, or, as far as the record shows, to disturb or destroy any other roof in the Dixie community.
Plaintiff's contention is that the felt paper placed by its employees on the portion of the church roof through which the water came and from which the old asbestos shingles had been removed, was applied in a normal and regular manner accepted in the roofing industry. Its workman in charge testified that the felt paper was nailed down carefully, using one inch nails through metal caps and that these were placed 2 1/2 inches to 3 inches apart along the seams of the overlapping sheets and staggered about 9 inches apart over the rest of the roof.
The record discloses that the plaintiff company has been in the roofing business for many years. Mr. Stroud, the man who represented the church in its dealings with the roofing company, testified that he had always sought the services of the company when he had a job that he wanted well done. There is no doubt in our minds about the good faith and sincerity of the company's officials. The fact that the employee responsible for applying the sub-roof to the church property testified that he nailed the paper on properly and secured the seams with nails and caps at the close interval of 2 1/2 to 3 inches, indicates that this acceptable method of nailing down a sub-roof was the policy and custom of the plaintiff company.
The defendant denied that the sub-roofing paper was securely or properly nailed down and produced convincing testimony — from witnesses who went into the church attic and examined the nail ends projecting through the planks which supported the roof — that the nails were not a maximum of 3 inches apart as testified by plaintiff's roofer, but actually were separated by 12 or 15 inches.
We conclude therefore that, although it was a practice of the plaintiff company to "sub-in" an exposed roof in a safe and prudent manner, actually this particular employee did not perform this job in the manner claimed by him on the trial and prescribed by his employer, and that the inadequate securing of this sub-roof by plaintiff's employee was an immediate contributing cause of the water damage done to the contents of the church building on December 31, 1947.
The record sustains the finding of the District Court that defendant's loss amounted to the $400 claimed by the defendant.
The judgment is affirmed, with costs. *Page 310